UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

SAMUEL SIERRA,

                              Petitioner,

      -vs-                       **No. 1:12-CV-0531(MAT)**
                                       **DECISION AND ORDER**

MARK BRADT, Superintendent, Attica
Correctional Facility,

                           Respondent.

─────────────────────────────

## I.    Introduction

Samuel Sierra ("Petitioner") has filed a <u>pro se</u> petition for
a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that
he is being held in Respondent's custody in violation of his
federal constitutional rights. Petitioner is incarcerated following
a judgment entered on November 5, 2007, in New York State, Monroe
County Court (Egan, J.), convicting him, after a jury trial, of
second degree manslaughter, second degree vehicular manslaughter,
driving while intoxicated, and lesser related charges.

## II.  Factual Background and Procedural History

Petitioner's conviction stems from an accident in which his
car struck the vehicle being driven by Michael Civiletti
("Civiletti"), causing Civiletti's death. The collision occurred at
the intersection of Norton Street and Portland Avenue in the City
of Rochester at around 10:00 p.m. on October 14, 2006. Petitioner
was indicted by a Monroe County grand jury on charges of
Manslaughter in the Second Degree (N.Y. Penal Law ("P.L.")

§ 125.15(1)); Vehicular Manslaughter in the Second Degree (P.L. § 125.12(1)); Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree (Vehicle and Traffic Law ("V.T.L.") § 511(3)(iii)); two counts of Operating a Motor Vehicle While Under the Influence of Alcohol (V.T.L. §§ 1192(2), (3)); and a traffic violation of passing a red light (V.T.L. § 1111).

### A.  Pre-Trial Proceedings

On April 27, 2007, the matter was scheduled for a suppression hearing before Monroe County Court Judge John Connell. After arriving late for the scheduled hearing, the prosecutor announced that he had no witnesses, but he did not request an adjournment of the hearing or of trial. Judge Connell called the attorneys up to the bench, and a conference ensued which was not transcribed.

When the proceedings reconvened, trial counsel stated that Petitioner was prepared to plead guilty to the full indictment with the understanding that the trial court was promising an indeterminate sentence of 4½ to 9 years. The prosecutor said nothing to indicate any disagreement with the promised sentence before Petitioner pled guilty to the indictment, and ultimately approved the sufficiency of Petitioner's colloquy.

At the very end of the proceedings, the prosecutor said, "Just for the record, Judge, please note our opposition to the plea to the indictment." 4/27/07 Transcript ("Tr.") at 14. The prosecutor

did not elaborate on this statement. The matter was adjourned for sentencing.

On May 24, 2007, prior to the scheduled sentencing date, the parties appeared before Judge Connell, who inquired about the prosecutor's statement at the previous appearance and asked whether it was really the sentence to which he was opposed. 5/24/07 Tr. at 2. The prosecutor stated that he had been clear that the sentence should be 7½ to 15 years. Judge Connell then recounted what had transpired at the off-the-record conference on April 24, 2007, when the prosecutor had been unprepared for the suppression hearing. At that time, defense counsel indicated that his client was willing to plead guilty with a sentence promise of 4½ to 9 years, and that a pre-plea investigation had already been completed. Judge Connell asked the prosecutor whether, "given the scheduling issues, the fact that the People were not prepared to go ahead with the scheduled [suppression] hearing, and the fact that the defendant was now willing to plead guilty to all the charges contained in the indictment, he felt that a change in his original position–sentence position[1] would result." 5/24/07 Tr. at 6. The prosecutor replied only that he wanted to tell the victim's family, and he left to do so. Judge Connell noted that in the absence of any stated opposition to the proposed plea arrangement, he believed that the

---

[1]
At a court appearance three months earlier, the prosecutor had expressed the opinion that an appropriate sentence was 7½ to 15 years.

prosecutor was changing his position and agreeing to a sentence of 4½ to 9 years. Id. at 7.

When the prosecutor re-entered the courtroom on May 24, 2007, he failed to make a request for an adjournment, and made no mention of any opposition to the plea and sentence that had just been discussed. Indeed, Judge Connell noted, the prosecutor had facilitated the entry of the plea, and it was only after the plea had been entered that the prosecutor "note[d]", "for the record", his "opposition to the plea to the indictment." 5/24/07 Tr. at 8.

Judge Connell noted that almost immediately after Petitioner entered his plea on April 24, 2007, the friends and family of the victim began expressing outrage. While he had not been privy to the discussions between the family and the District Attorney's Office, Judge Connell stated he could only "assume from the public statements that the family was at best misinformed and at worst intentionally mislead about the disposition of the case." 5/24/07 Tr. at 8. A month later, Judge Connell still was receiving letters from Civiletti's family and friends. Judge Connell opined that the prosecutor had only agreed to the plea disposition because of his failure to be prepared for the suppression hearing on April 27th day and his subsequent decision, for whatever reason, not to request an adjournment of the hearing or of trial. Judge Connell noted that he would not have agreed to a sentence of 4½ to 9 years over the prosecutor's objection, and that since the prosecutor had now made

his opposition clear, he would not be able to honor his sentence promise of 4½ to 9 years. Id. at 10.

Petitioner was presented with two options and given a week to decide between them: he could proceed with sentencing knowing that the 4½-to-9-year sentence would not be honored, or he could withdraw his plea and proceed to trial. Judge Connell recused himself, and the case was transferred to Judge David Egan.

At a court appearance before Judge Egan, defense counsel argued that the promised sentence should be imposed because the plea had been taken to the indictment, a pre-plea investigation had been done and there had been no surprises, and ex parte communications had caused the court to change its mind. Judge Egan declined to do so, and Petitioner withdrew his guilty plea.

A suppression hearing was held concerning the admissibility of two statements made by Petitioner when he was at the hospital after the car crash. Petitioner also moved to suppress the results of the blood-alcohol test, alleging that the procedures for obtaining a court order for the drawing of his blood had not been followed. Judge Egan denied Petitioner's requests to suppress the statements and the blood-alcohol test results.

**B.    The Trial**

Eyewitness Toriya White ("Toriya") was in a car on Portland Avenue, waiting to turn left onto Norton Street, when she saw a red car driving very fast pass through a red light heading down

Portland Avenue. Toriya observed another car, a gray Saturn, enter the intersection. The gray car was struck by the red car and went "airborne", hitting a building on the corner of Portland Avenue and Norton Street. T.14-15.[2] White called 911 and approached the gray car, where the driver was slumped over towards the passenger seat and did not appear to be breathing.

When Toriya approached the red vehicle, she found it empty. She asked where the driver was, and Petitioner, who was outside the car, answered, "I am right here. You saw him hit me, right?" T.18-19. According to Toriya, Petitioner's eyes were "glossy" and he appeared to be "intoxicated or under the influence of something". T.20.

At the same time, Karen White ("Karen") was also driving on Portland Avenue with her daughter. They were stopped at a red light waiting to make a left hand turn onto Norton Street. T.206. Karen also saw Petitioner's red car run the red light, enter the intersection, and hit the gray car "like a T-bone." T.207-08. Approaching Petitioner, Karen heard him say, "Where is the guy who hit me?" and "You saw him hit me." T.211.

Emergency Medical Technician Richard Steinbroner, who responded to the accident, testified that he smelled alcohol on Petitioner's breath, and that Petitioner told him he had had a "few

---

[2]
Citations to "T.___" refer to pages from the transcript of Petitioner's trial.

beers". T.234, 237. Steinbroner opined that Petitioner was intoxicated. Id.

Rochester Police Department ("RPD") Officer Kimberly Rasbeck saw Petitioner in the emergency department of Strong Memorial Hospital at about 10:15 p.m. and attempted to interview him. However, he was uncooperative and would not answer questions other than to shake his head. T.272-74. Based upon Petitioner's bloodshot, watery eyes and his demeanor, Officer Rasbeck believed that he was intoxicated. T.274-76. Because Petitioner refused three times to take a chemical analysis test, Officer Rasbeck obtained a court order for a blood draw. T.281.

At 1:02 a.m., Registered Nurse Amy Coniglio drew Petitioner's blood. Petitioner was "combative", moving his arms and legs in an attempt to prevent her from drawing blood. T.307-09.[3]

At approximately 1:45 a.m., RPD Officer Naser Zenelovic informed Petitioner, who was handcuffed to a gurney, that he was under arrest for driving while intoxicated. T.428-30. In response, Petitioner announced, "I got hit. I was the one that got hit. It was me that got hit tonight." T.430. Officer Zenelovic directed

---

[3]
Testing on the blood sample drawn from Petitioner was performed by laboratory technician Christine Wallace at the Monroe County Medical Examiner's Office. Wallace testified, over defense counsel's objection to the lack of proper foundation, that the result of gas chromatograph testing was a blood alcohol content of 0.176 on the first assay and 0.175 percent on the second.

Petitioner not to speak, but Petitioner insisted, "I was the one that almost got killed tonight." T.430.

RPD Officer Otto Harnischfeger ("Officer Harnischfeger") was assigned to guard Petitioner at the hospital. At 4:55 a.m., Officer Harnischfeger was sitting outside Petitioner's hospital room and heard Petitioner say, "I was fixing my friend's brakes. I only had a few beers. I didn't even buy the beers." T.424. Petitioner was alone in the room at the time.

Jon Northrup ("Northrup"), of the RPD's Special Accident Investigation Unit, took measurements at the accident scene, examined pavement marking, and performed a number of other tests to determine that speeds of the two cars prior to impact. According to Northrup, the victim's car was traveling at a speed of 15 to 24 miles per hour, while Petitioner's car was traveling at a speed of 55 to 60 miles per hour. T.363, 382.

The defense called several of Petitioner's friends who all had been with him before the accident. Belinda Rivera Vasquez ("Vasquez"), a teacher and family friend, testified that she arrived at a mutual friend's house around two in the afternoon, and Petitioner proceeded to fix the brakes on her car over the course of the evening. The work was done sometime after dark. Vasquez observed Petitioner consume about four beers over a five-hour period, but she believed he was fine to drive. T.486.

Carlos Castillo Moralles ("Moralles") saw Petitioner drinking but was not sure how much he consumed. According to Moralles, an 18-pack of beer was shared by four people. Moralles thought that Petitioner appeared to be fine to drive. T.502.

Daisy Ortiz ("Ortiz") estimated that Petitioner had about five or six while working on the car and afterwards. Ortiz testified that she had seen Petitioner stand and walk, and had heard him talk before he left her house. In her opinion, he was fine to drive. T.515-18.

Julie Rivera ("Rivera") testified that she had seen Petitioner walk and had spoken with him before he left the house. Rivera opined that Petitioner was not intoxicated and appeared fine. T.529.

The jury deliberated for approximately four hours before returning a verdict of guilty on all counts. On November 5, 2007, Petitioner was sentenced to 7½ to 15 years in prison on the top count of manslaughter in the second degree. Lesser concurrent terms were imposed on the remaining counts.

Represented by new counsel on appeal, Petitioner argued that (1) Judge Connell, having agreed to a plea with a sentence of 4½ to 9 years, improperly refused to honor the sentencing promise and delegated his sentencing discretion to the prosecutor and to the public; (2) Judge Egan applied the incorrect "spontaneity" standard in determining the admissibility of the statements made by

Petitioner at the hospital; (3) the blood test results should have been suppressed based upon the prosecution's failure to comply with V.T.L. § 1194(3)(D); (4) the prosecution failed to establish the requisite evidentiary foundation for admission of the blood test results; and (5) the sentence was harsh and excessive.

On June 17, 2011, the Appellate Division, Fourth Department, unanimously affirmed petitioner's judgment of conviction, and the New York Court of Appeals denied leave to appeal on October 21, 2011. People v. Sierra, 85 A.D.3d 1659 (4th Dep't 2011), lv. denied, 17 N.Y.3d 905 (2011).

This timely habeas petition followed, in which Petitioner raises the first, second, and third claims raised by appellate counsel on direct appeal. Respondent answered the petition, asserting that two of Petitioner's claims are unexhausted but must be deemed exhausted and procedurally defaulted. Respondent alternatively argues all of Petitioner's claims lack merit. Petitioner filed a traverse to Respondent's opposition.

This matter was transferred to the undersigned on September 26, 2013. Because Petitioner's claims are easily resolved on the merits, the Court has elected to bypass the issue of procedural default. For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. Discussion

### A. Ground One: The Plea Court Abused Its Discretion in Refusing to Impose the Promised Sentence of 4½ to 9 Years.

Petitioner claims, as he did on direct appeal, that the plea court abused its discretion by declining to impose the promised sentence of 4½ to 9 years imprisonment in exchange for Petitioner's guilty plea to the entire indictment. The Appellate Division rejected Petitioner's contention that the plea court abused its discretion in refusing to abide by the sentencing commitment of the plea agreement, noting that a judge retains discretion in fixing an appropriate sentence up until the time of sentencing. Sierra, 85 A.D.2d at 1659 (citation omitted). In view of the plea court's explanation for its determination not to abide by the sentencing commitment, the Appellate Division could not conclude that there was an abuse of discretion. Id. (citation omitted). Relatedly, Petitioner was not entitled to specific performance of the plea agreement because he had not been placed in a "no-return position in reliance on the plea agreement . . . such that specific performance [was] warranted as a matter of essential fairness[.]" Id. (quotation omitted).

The United States Supreme Court has "expressly declined to hold that the Constitution compels specific performance of a broken prosecutorial promise as the remedy for . . . a plea [that is invalid]. . . ." Mabry v. Johnson, 467 504, 511 n.11 (1984) (citing

Santobello v. New York, 404 U.S. 257, 261-62 (1971)), overruled in part on other grounds by Puckett v. United States, 556 U.S. 129 (2009). In Santobello, the Supreme Court concluded that "the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by remanding the case to the state courts for further consideration." 404 U.S. at 262-63. The Supreme Court left "[t]he ultimate relief" to which the petitioner was entitled "to the discretion of the state court" because it was "in a better position" to decide whether the circumstances warranted only specific performance of the agreement on the plea or, instead, the relief sought by petitioner Santobello, which in that case was the opportunity to withdraw his guilty plea. Id. at 263.

In light of Mabry and Santobello, it is clear that Petitioner did not have a federal constitutional right to obtain specific performance, i.e., the imposition of the 4½-to-9-year sentence promised in exchange for his guilty plea. The Appellate Division's resolution of Petitioner's claims pertaining to the withdrawn plea and sentence promise do not represent an erroneous application of relevant federal law, much less an unreasonable application of that law.

**B.    Ground Two: Petitioner's Statements Should Have Been
       Suppressed.**

Petitioner claims that his statements to the police while he
was at the hospital should have been suppressed because he had
invoked his rights under Miranda v. Arizona, 384 U.S. 466 (1966),
by requesting an attorney. The Appellate Division agreed that the
record established that Petitioner "made an unequivocal request for
counsel[,]" but "[e]ven assuming, arguendo, that [his] indelible
right to counsel had attached when he made the disputed
statements[,]" suppression was not required. Sierra, 85 A.D.3d at
1660 (citations and quotations omitted). The Appellate Division
concluded that the statements "were spontaneous inasmuch as 'they
were in no way the product of an interrogation environment [or] the
result of express questioning or its functional equivalent[.]'" Id.
(quoting People v. Harris, 57 N.Y.3d 335, 342, cert. denied, 460
U.S. 1047 (1983) (internal quotation marks omitted in original;
other citations omitted)).

The Appellate Division assumed for the sake of argument that
Petitioner's right to counsel clearly had attached by virtue of his
request, prior to his blood being drawn, to speak with an
attorney.[4] Under New York state constitutional law, which is more

_____

    [4]
    "[T]he State constitutional right to counsel attaches
indelibly in two situations. First, it arises when formal judicial
proceedings begin, whether or not the defendant has actually
retained or requested a lawyer. Second, the right to counsel
attaches when an uncharged individual 'has actually retained a

protective of defendants than federal constitutional law, e.g., People v. Ramos, 99 N.Y.2d at 32-33, no further questioning of Petitioner would have been permissible once the right to counsel was invoked, unless Petitioner affirmatively had waived his rights in the presence of his attorney. People v. Rogers, 48 N.Y.2d 167, 170-71 (1979) (citations omitted). The New York Court of Appeals has held that "[n]otwithstanding this rule, statements made by a defendant who has invoked the right to counsel may nevertheless be admissible at trial if they were made spontaneously." Harris, 57 N.Y.3d at 342. In order for such statements to be characterized as spontaneous, the prosecution must demonstrate that they "were in no way the product of an 'interrogation environment', the result of 'express questioning or its functional equivalent[.]'" Id. (quoting People v. Stoesser, 53 N.Y.2d 648, 650 (1981)).

Petitioner argues that the state courts incorrectly applied the Miranda standard for determining whether his statements were the product of custodial interrogation rather than asking whether the statements were "genuine[ly]" "spontaneous" and "not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed." People v. Maerling, 46 N.Y.2d 289, 303 (1978). A reading of the relevant case law establishes that Petitioner's argument is not well-founded. The language used by the

---

lawyer in the matter at issue or, while in custody, has requested a lawyer in that matter[.]'" People v. Ramos, 99 N.Y.2d 27, 32-33 (N.Y. 2002) (internal citation and quotation omitted).

New York Court of Appeals regarding "genuine spontaneity" and "inducement, provocation, encouragement or acquiescence" appears to be a gloss on phraseology used by the Supreme Court to describe when statements are considered voluntary. E.g., Rhode Island v. Innis, 446 U.S. 291, 299, 300-01 (Miranda's protections encompass statements that are the product of the "interrogation environment", that is, the result of "express questioning or its functional equivalent", i.e., "any words or actions that the police should know are reasonably likely to elicit an incriminating response"). Thus, in People v. Harris, 57 N.Y.2d 335, 342 (1982), the New York Court of Appeals explained that

> statements made by a defendant who has invoked the right to counsel may nevertheless be admissible at trial if they were made spontaneously. *In order for such statements to be characterized as spontaneous, it must "be shown that they were in no way the product of an 'interrogation environment', the result of 'express questioning or its functional equivalent[.]'"*

Id. (quotation omitted) (emphasis supplied). Petitioner's argument is, at bottom, premised on his parsing of New York state law cases. A violation of state constitutional law, which the Court has not found occurred in Petitioner's case, does not automatically rise to the level of a federal error. Analyzed under federal constitutional law, it is plain that Petitionier's argument does not have merit.

At the suppression hearing, Officer Zenelovic testified that while Petitioner was handcuffed to a gurney at the hospital, he informed Petitioner that he was under arrest for driving while

intoxicated. Petitioner responded, "I was the one that got hit, I got hit." Given that Officer Zenelovic cautioned Petitioner to stop speaking at that point, it cannot be said that his comment was the result of police "inducement, provocation, encouragement or acquiescence," People v. Stoesser, 53 N.Y.2d at 650 (quotation omitted). Petitioner did not heed the warning and repeated that he had gotten hit, adding, "I was almost killed tonight." H.15-17.[5]

Officer Harnischfeger testified that while he was guarding Petitioner's hospital room, he overheard Petitioner say to no one in particular, "I was fixing my friends brakes. I had a few beers. I didn't even buy the beers." H.6-11. Petitioner was alone in the room at the time, and Officer Harnischfeger had not asked Petitioner any questions. Based on these facts, neither Officer Harnischfeger nor Officer Zenelovic asked Petitioner any questions or did anything to encourage or elicit a response. Therefore, the state court did not err in concluding that Petitioner's statements were spontaneous and not the result of custodial interrogation. See, e.g., Wolfrath v. LaVallee, 576 F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a gratuitously volunteered statement, Miranda itself is inapplicable, for spontaneous statements which are not the result of 'official

_____

[5]
Citations to "H.___" refer to pages from the transcript of the pre-trial suppression hearing.

-16-

interrogation' have never been subject to its strictures.")
(citations omitted).

**C.  Ground Three: The Blood-Alcohol Test Results Were Erroneously Admitted.**

Petitioner contends that the results of his blood-alcohol test should have been suppressed because the prosecution failed to prove that the gas chromatograph machine was properly calibrated. The Appellate Division rejected this claim, finding that the prosecution laid the requisite foundation establishing the reliability and accuracy of the machine used to measure Petitioner's blood-alcohol content. Sierra, 85 A.D.3d at 1661 (citations omitted). The Appellate Division further rejected Petitioner's contention that the witness who testified regarding the blood-alcohol test was not qualified to opine with regard to the accuracy of the machine used to conduct that test. Id. (citation omitted).

Questioning a state court's application of state evidentiary rules does not, in and of itself, amount to a basis for a constitutional challenge. Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) (citing Taylor v. Curry, 708 F.2d 886, 891 (2d Cir.), cert. denied, 464 U.S. 1000 (1983)). The writ may issue "*only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial." Id. (quoting Taylor, 708 F.2d at 891 (alterations and emphases in original)). Petitioner has failed to explain how the state court's evidentiary ruling concerning whether

a proper foundation had been laid to admit the gas chromatography results resulted in a fundamentally unfair trial. See, e.g., Welch v. Artus, No. 04-CV-205S, 2007 WL 949652, at *56 (W.D.N.Y. Mar. 29, 2007) (citing Boyd v. Keane, No. 89 CIV.2040,1990 WL 43930, at *4 (S.D.N.Y. Apr. 9, 1990) ("[Petitioner] argued that the chemists' testimony was improperly admitted because the prosecution failed to lay a proper foundation. Specifically, he argued that before the chemists could testify as to their opinion, the prosecution had to establish the reliability of their tests, which could only be done by showing that the white powder was scientifically compared to a known sample of cocaine. [Petitioner]'s claim is without merit.")); Moreover, the forensic toxicology technician, during direct examination and cross-examination, thoroughly explained the process for testing blood samples via gas chromatography. She testified that the gas chromatograph is a scientifically reliable means for identifying alcohol in the blood and is generally accepted in the scientific community as accurate and reliable. T.322-23, 327, 343-44. Before testing Petitioner's blood samples, the technician confirmed that the gas chromatograph was working properly by running several quality control tests using control samples. Petitioner's sample was tested twice, and each time the blood alcohol level content was .017 percent. T.327-29, 344-51, 354-56. Thus, even assuming that the trial judge incorrectly found that the prosecution had laid a proper foundation for admitting the evidence

under New York state law, the alleged error was cured by the subsequent testimony of the forensic toxicology technician. <u>See</u> <u>Payne v. McKune</u>, 280 F. Supp.2d 1259, 1270 (D. Kan. 2003) (state court's admission of DNA evidence despite lack of sufficient foundation did not infringe upon defendant's constitutional rights so as to warrant federal habeas relief; to the extent that the trial judge incorrectly found that the prosecution had laid a proper foundation for admitting the evidence under Kansas law, the alleged error was cured by the subsequent testimony of a Kansas Bureau of Investigation forensic scientist).

Petitioner also asserts that he was denied his right to speak with counsel prior to the blood test. Under New York state law, in exchange for the privilege of being licensed to drive, every motorist is deemed to have given advance consent to submit to such a "search" where certain conditions precedent are present. <u>See</u> N.Y. Vehicle & Traffic L. §§ 1194(1); 1194(2)(a)(1)(2)). Since the privilege to drive is a creature of New York statutory law, enacted concomitantly with a deemed consent provision, New York courts have held that, where the conditions precedent in Sections 1194(1) and (2) are present, an individual driver in New York has no constitutional right to refuse to submit to a police requested blood-alcohol or other chemical test. <u>E.g.</u>, <u>People v. Shaw</u>, 72 N.Y.2d 1032, 1033 (1988) ("The defendant has no constitutional right to refuse to consent to such a search [under V.T.L. § 1194].

The right is entirely statutory and, by its terms, may be waived without an attorney's assistance. The Sixth Amendment does not require that the defendant be afforded counsel at this stage in the proceedings.") (internal citations omitted). For purposes of Section 1194, an individual does not have a right to "condition his or her consent to a chemical test to determine blood alcohol content on first consulting with counsel." Boyce v. Commissioner of N.Y. State Dep't of Motor Vehicles, 215 A.D.2d 476, 477 (2d Dept. 1995).

Moreover, the United States Supreme Court has upheld laws requiring a person arrested for drunk driving to submit to a blood alcohol test or face having his refusal used against him. E.g., South Dakota v. Neville, 459 U.S. 553, 559 (1983). The Supreme Court held in Neville that a defendant's refusal to take a blood-alcohol test, after a police officer lawfully requested it, was not an act coerced by the officer, and thus was not protected by the privilege against self-incrimination. 459 U.S. at 564. The Supreme Court noted that the "simple blood-alcohol test" was "so safe, painless, and commonplace," that the "state could legitimately compel the suspect, against his will, to accede to the test." Id. (internal citations omitted).

In sum, the police could legitimately compel Petitioner to submit to a blood-alcohol test, without his consent, and not offend any of his federal or state constitutional rights. The Court finds

that Petitioner's claim that the blood-alcohol test was administered in violation of his Fifth Amendment right to counsel is without merit. <u>See</u>, <u>e.g.</u>, <u>Haynes v. Brat</u>, No. 06-CV-6188L, 2007 WL 3047101, at *9 (W.D.N.Y. Oct. 18, 2007) (holding that police could legitimately compel habeas petitioner to submit to a breathalyzer test, without his consent, and not offend any of his federal or state constitutional rights; claim that the breathalyzer test was administered under duress, in violation of Petitioner's Fifth Amendment rights, was factually unsupported and without merit) (citations omitted).

## IV. Conclusion

For the foregoing reasons, Petitioner's request for a writ of habeas corpus is denied, and the petition (Dkt #1) is dismissed with prejudice. Because Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability shall issue.

**SO ORDERED.**

S/Michael A. Telesca

_____
MICHAEL A. TELESCA
United States District Judge

DATED:    October 18, 2013
          Rochester, New York